## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
(Palm Beach Division)

JOSEPH MINK  AND STEPHANIE )
MINK, his spouse )
             Plaintiffs, )   **CASE NO: 15-CV-6120**
              )
v. )
  )
SMITH & NEPHEW, INC., a foreign )
corporation, )
             Defendant. )

## COMPLAINT

The Plaintiffs, JOSEPH MINK and STEPHANIE MINK, his spouse (hereinafter "Plaintiffs" or "MINKS") brings this Complaint against the Defendant, SMITH & NEPHEW, INC. (hereinafter "SMITH & NEPHEW") and states and alleges as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs are citizens of the state of Florida.

2.      Defendant Smith & Nephew, Inc. is incorporated in Delaware with its principal place of business located in Shelby County, Tennessee. Defendant also maintains a registered agent in Broward County, Florida.

3.      This court has subject matter jurisdiction under 28 U.S.C. § 1332, based on diversity of citizenship between the parties, and the amount in controversy exceeding $75,000 (seventy-five thousand dollars) exclusive of interest and costs.

4.      Defendant has regularly and systematically transacted business in the state of Florida, committed tortious acts in this state, and has entered into contracts in this state

for the sale of goods, and made promises and representations to the Plaintiffs through surrogates in this state. Therefore, this court has personal jurisdiction over the Defendant pursuant to the Florida long arm statute.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c), as the Defendant conducts business, engages in sales activity, and made promises and representations to the Plaintiff, JOSEPH MINK, in this district. Therefore, venue is proper in this district.

## FACTUAL BACKGROUND

6.      Defendant, among other things, develops and manufactures joint replacement systems. Its orthopedics division is located at 1450 E. Brooks Road, Memphis, Tennessee.

7.      Prior to June 2, 2011, Defendant manufactured, introduced, or delivered for introduction into interstate commerce, including the state of Florida,  the Birmingham Hip Resurfacing ("BHR") System.

8.      The BHR system is a metal-on-metal hip resurfacing prosthesis, comprised of a femoral head and a hemispherical acetabular cup.

9.      Before commercially distributing the BHR in the United States, Defendant submitted an application for premarket approval ("PMA") of the device to the Secretary of Health and Human Services and on May 9, 2006, the Food and Drug Administration ("FDA") conditionally approved the BHR for commercial distribution based on its review of the materials submitted by the Defendant.  A copy of the May 9, 2006 letter is attached as Exhibit A and incorporated herein by reference.

10.     The conditional approval letter from the FDA allows the Defendant to distribute the BHR in accordance with the conditions described in the above letter, and any distribution of the BHR that is not in compliance with the letter's conditions is a violation of the Federal Food, Drug, and Cosmetic Act ("Act").

11.     Plaintiff, JOSEPH MINK, was diagnosed by his treating orthopedic surgeon as needing a hip replacement using another manufacturer's hip replacement system.

12.     Plaintiff, JOSEPH MINK, was scheduled for surgery with another manufacturer's hip replacement system when he learned through advertisements put out by Defendant of its BHR system.

13.     Plaintiff, JOSEPH MINK, was directed by Defendant to a local orthopedic surgeon, Jason Weisstein, MD, who was at all times acting as an agent and representative of Defendant, as it related to the marketing of the BHR system.

14.     Jason Weisstein, MD met with Plaintiff, JOSEPH MINK and his wife, STEPHANIE MINK, and advised them of the fact that the BHR received FDA pre-market approval and that if Plaintiff, JOSEPH MINK, agreed to used the BHR that Defendant would include Plaintiff, JOSEPH MINK, in its 10-year post approval study where he would be regularly monitored with follow-up visits and testing for 10 years and with Defendant agreeing to pay the costs associated with the required procedures, including metal on metal assessments of renal function, samples of blood to measure metal ions in the blood and body and other tests to evaluate the BHR system.

15.     Based on the representations made by Jason Weisstein, MD, acting as the agent and local representative of Defendant, Plaintiff, JOSEPH MINK, agreed to undergo

3

hip replacement surgery using the BHR system and he signed the "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-Centered Study of the Birmingham Hip Resurfacing System" in which he agreed to become a study participant.  A copy of this Agreement is attached as Exhibit B and is incorporated herein by reference.

16.    On June 6, 2011, Jason Weisstein, MD performed left hip metal on metal resurfacing on Plaintiff, JOSEPH MINK, using the above-described BHR system.

17.    Based on the representations of Jason Weisstein, MD, as the agent and local representative of , and the terms of the Muti-Centered Study in which Plaintiff, JOSEPH MINK, was now a participant and expected that he would be monitored, tested, and followed for the next 10 years as promised.

18.    Plaintiff, JOSEPH MINK, called to the office of Jason Weisstein, MD, for his 6-week Study follow-up and could not get an appointment.

19.    Then, 7 weeks after the BHR surgery, Jason Weisstein, MD advised Plaintiff, JOSEPH MINK, in an August 1, 2011 letter that he was relocating and that the follow-up under the "FDA Birmingham Resurfacing Study at his office will not continue. A copy of his letter is attached as Exhibit C and is incorporated herein by reference.

20.    In a letter dated August 18, 2011, Jason Weisstein, MD, advised Plaintiff, JOSEPH MINK, that Defendant had arranged for him to continue as a participant in the Study with a Doctor Gregory Martin in Boynton Beach, Florida. A copy of the letter is attached as Exhibit D and is incorporated herein by reference.

21.    Plaintiff, JOSEPH MINK, contacted Dr. Gregory Martin, and went to his office for what he believed was a Defendant paid clinical office under the Study;

4

however, Dr. Gregory Martin knew nothing about the Plaintiff or his being part of the Defendant's Study and charged him for the office visit that was to be paid by Defendant.

22.     Defendant had done nothing to live up to its commitment to Plaintiff, JOSEPH MINK, and to the FDA, to engage in a Post-Approval study with Plaintiff as one of the 350 participants.  This abandonment of Plaintiff was memorialized by Defendant in a letter dated May 14, 2012 titled: "BHR-Birmingham Hip Resurfacing System Post Approval Study" in which Plaintiff, JOSEPH MINK, was advised that it terminated the study, could not locate a clinical site to continue follow-up study activities and that it was "releasing him of any/and all follow-up obligations per protocol."  A copy of the letter is attached as Exhibit E and is incorporated herein by reference.

23.     Plaintiff, JOSEPH MINK, did not want to be terminated from the study as he had been experiencing elevated chromium and cobalt levels in his blood within a short time after surgery.  Monitoring chromium and cobalt levels was one of the commitments made by Defendant as part of the Study.

24.     Plaintiff, JOSEPH MINK, continued on his own with blood tests at his own expense because of his experiencing adverse effects from the metal ions.  The tests continue to show increased signs of elevated chromium and cobalt levels in his blood, which to the human body  is an unreasonably dangerous condition.

25.     Plaintiff, JOSEPH MINK, then began experiencing  eye problems and an enlarged left inguinal lymph node on the left side near the operative site, which had to be surgically removed.  These symptoms were all caused by the unsafe and defective condition of the BHR system.

26.     Plaintiff, JOSEPH MINK, continued to experience adverse symptoms from the elevated chromium and cobalt levels in his system that were much higher than levels reported by Defendant to the FDA in order to obtain pre-market approval,  which indicates that the BHR surgically implanted into Plaintiff was unreasonably dangerous and defective when it left the manufacturing facility of the Defendant.

27.     The Defendants BHR system that was surgically implanted into Plaintiff, JOSEPH MINK, was defective in that it did not meet the requirements of the FDA to comply with current good manufacturing practices to insure that the finished BHR will be safe and effective and otherwise in compliance with 21 USC Section 360(e) as a properly manufactured BHR that would not cause toxic levels of chromium and cobalt in the Plaintiff's blood in normal use.

28.     Plaintiff, JOSEPH MINK, had an adverse reaction, side effects, injury, and toxicity that is directly attributable to the BHR system that required Defendant, if it was properly monitoring Plaintiff, JOSEPH MINK, as a study participant, to file with the FDA an "Adverse Reaction and Device Defect Report within 10 days of knowledge of this information.

29.     Defendant abandoned Plaintiff, JOSEPH MINK, and terminated him and the Boca Raton Community Hospital from the Study, in an apparent attempt to remove him from any reporting requirements for Study participants.  (Exhibit E)

30.     On November 17, 2014, Plaintiff, JOSEPH MINK, underwent revision surgery to remove the BHR that was poisoning his system because of a defect in the design or manufacture that caused elevated chromium and cobalt levels, which significantly exceeded the safe and  acceptable levels of such metals in the blood system,

and which were needed in order to demonstrate to the FDA that the BHR was safe and effective.

## COUNT I

### NEGLIGENCE BASED ON VIOLATIONS OF 21 C.F.R. 820.30(f) and (g), 21 C.F.R. 820.80(c) and (d), 21 C.F.R. 820.100, 21 C.F.R. 820.198

Plaintiff, JOSEPH MINK, restates, re-alleges and incorporates by reference paragraphs 1-30 of this Complaint as though fully set forth in this Count.

31.     The BHR implanted in Plaintiff, JOSEPH MINK, on June 6, 2011 was designed and/or manufactured in violation of 21 USC Section 360, et. seq. (hereinafter the "Act") and federal regulations promulgated pursuant to it.

32.     As of June 6, 2011 Defendant knew or should have known that there were unanticipated adverse effects, increases in the incidents of anticipated adverse effects and device failures necessitating labeling, manufacturing or device modifications and it nevertheless failed or refused to submit the required PMA supplement to the FDA.

33.     Submitting records of dangerously high levels of Chromium and Cobalt in the blood of BHR system recipients in a PMA supplement would have alerted the FDA to the dangers of this product and would have jeopardized Defendants PMA status.

34.     The Defendant had the duty to comply with the Act, and all regulations promulgated pursuant to it.

35.     Notwithstanding this duty, the Defendant violated the Act and the FDA requirement that Defendant comply with good manufacturing practices in one or more of the following ways:

a. Failed to accurately establish the in vivo life expectancy of the BHR, in violation of 21 C.F.R. 820.30(f);

7

b. Failed to validate the anticipated wear of the femoral head prior to being released into commercial distribution, in violation of 21 C.F.R. 820.30(g);

c. Failed to establish and maintain appropriate reliability assurance testing to validate the BHR design before and after its release into the marketplace, in violation of 21 C.F.R. 820.30(g);

d. Failed to identify the component discrepancy, in violation of 21 C.F.R. 820.80(c);

e. Failed to capture the component discrepancy, in violation of 21 C.F.R. 820.80(c);

f. Failed to correct the component discrepancy, in violation of 21 C.F.R. 820.80(c);

g. Failed to capture the component discrepancy or defect during its Acceptance Activities, in violation of 21 C.F.R. 820.80(d);

h. Failed to establish and maintain procedures for implementing corrective and preventative action in response to complaints regarding the BHR and/or other quality problems associated with the BHR, in violation of 21 C.F.R. 820.100;

i. Failed to appropriately respond to adverse incident reports that indicated the BHR was malfunctioning, or otherwise not responding to its Design Objective Intent, in violation of 21 C.F.R. 820.198;

j. Failed to conduct complete device investigations on returned BHR and components, in violation of 21 C.F.R. 820.198; and,

k. Continued to inject BHR systems into the stream of interstate commerce when it knew, or should have known, that the BHR system was malfunctioning by causing significantly high levels of chromium and cobalt in the consumer or user's body, which Defendant knew or should have known were unreasonably dangerous to the consumer or user, or otherwise not responding to its Design Objective Intent.

l. Failed to ensure that the finished BHRs were safe and effective and otherwise in compliance with 21 C.F.R. 820.1.

m. Failed to monitor the users and consumers and report high levels of chromium and cobalt levels to the FDA in compliance with the reporting requirements under 21 CFR 820.80.

n. Failed to take appropriate and corrective and preventative action under 21 C.F.R. 820.100, knowing that the BHR system was resulting in high levels of chromium and cobalt that was greater than claimed in order to obtain pre-market approval.

o. Failing to adequately conduct metal ion testing in the 5 years between Premarket Approval on May 11, 2006 and June 6, 2011, the date that the BHR was implanted into the Plaintiff.

36.    As a direct and proximate result of Defendant's violations of one or more of these federal statutes and regulations, Plaintiff suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation costs, lost income, and pain, suffering, scaring, the pain and suffering and trauma of a second surgery to remove the BHR system,  and loss of the enjoyment of life, for which he is entitled to relief under Florida law.

37.    Plaintiff, JOSEPH MINK, bases this Count entirely on the contention that the Defendant violated federal safety statutes and regulations, parallel to state common law claims.

38.    Under Florida law, the Defendant's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of common law negligence.

WHEREFORE, the Plaintiff, JOSEPH MINK, demands judgment in his favor and against the Defendant SMITH & NEPHEW, INC., in an amount in excess of $75,000 (seventy-five thousand dollars), plus costs of this suit.

## COUNT II
## STRICT PRODUCTS LIABILITY
### BASED ON VIOLATIONS OF 21 C.F.R. 820.30(f) and (g),
### 21 C.F.R. 820.80(c) and (d), 21 C.F.R. 820.100, 21 C.F.R. 820.198

Plaintiff, JOSEPH MINK, restates, re-alleges and incorporates by reference paragraphs 1-30 of this Complaint as though fully set forth in this Count.

37.     The BHR implanted in Plaintiff, JOSEPH MINK, on June 6, 2015 was designed and/or manufactured in violation of the Act and regulations promulgated pursuant to it.

38.     As of June 6, 2011 Defendant knew or should have known that there were unanticipated adverse effects, increases in the incidents of anticipated adverse effects and device failures necessitating labeling, manufacturing or device modifications and it nevertheless failed or refused to submit the required PMA supplement to the FDA.

39.     Submitting records of dangerously high levels of Chromium and Cobalt in the blood of BHR system recipients in a PMA supplement would have alerted the FDA to the dangers of this product and would have jeopardized Defendants PMA status.

40.     The Birmingham Hip Resurfacing System was "defective" and "unreasonably dangerous" when it left the control of Defendant and entered the stream of commerce and was implanted into Plaintiff, a user and consumer, due to non-compliance by the Defendant with the Act and the regulations promulgated pursuant to it in one or more of the following ways:

a. Failed to accurately establish the in vivo life expectancy of the BHR, in violation of 21 C.F.R. 820.30(f);

b. Failed to validate the anticipated wear of the femoral head prior to being released into commercial distribution, in violation of 21 C.F.R. 820.30(g);

10

c. Failed to establish and maintain appropriate reliability assurance testing to validate the BHR design before and after its release into the marketplace, in violation of 21 C.F.R. 820.30(g);

d. Failed to identify the component discrepancy, in violation of 21 C.F.R. 820.80(c);

e. Failed to capture the component discrepancy, in violation of 21 C.F.R. 820.80(c);

f. Failed to correct the component discrepancy, in violation of 21 C.F.R. 820.80(c);

g. Failed to capture the component discrepancy or defect during its Acceptance Activities, in violation of 21 C.F.R. 820.80(d);

h. Failed to establish and maintain procedures for implementing corrective and preventative action in response to complaints regarding the BHR and/or other quality problems associated with the BHR, in violation of 21 C.F.R. 820.100;

i. Failed to appropriately respond to adverse incident reports that indicated the BHR was malfunctioning, or otherwise not responding to its Design Objective Intent, in violation of 21 C.F.R. 820.198;

j. Failed to conduct complete device investigations on returned BHR and components, in violation of 21 C.F.R. 820.198; and,

k. Continued to inject BHR systems into the stream of interstate commerce when it knew, or should have known, that the BHR system was malfunctioning by causing significantly high levels of chromium and cobalt in the consumer or user's body, which Defendant knew or should have known were unreasonably dangerous to the consumer or user, or otherwise not responding to its Design Objective Intent.

l. Failed to ensure that the finished BHRs were safe and effective and otherwise in compliance with 21 C.F.R. 820.1.

m. Failed to monitor the users and consumers and report high levels of chromium and cobalt levels to the FDA in compliance with the reporting requirements under 21 CFR 820.80.

n. Failed to take appropriate and corrective and preventative action under 21 C.F.R. 820.100, knowing that the BHR system was resulting in high levels of chromium and cobalt that was greater than claimed in order to obtain pre-market approval.

41.     As a direct and proximate result of Defendant's violations of one or more of these federal statutes and regulations, Plaintiff suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, and pain, suffering, scaring, the pain and suffering and trauma of a second surgery to remove the BHR system,  and loss of the enjoyment of life, for which he is entitled to relief under Florida law.

42.     Plaintiff, JOSEPH MINK, bases this action entirely under the contention that the Defendant violated federal safety statutes and regulations, parallel to state common law claims.

43.     Under Florida  law, The Defendant's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort.

WHEREFORE, the Plaintiff, JOSEPH MINK, demands judgment in his favor and against the Defendant SMITH & NEPHEW, INC., in an amount in excess of $75,000 (seventy-five thousand dollars), plus costs of this suit.

## COUNT III
## BREACH OF CONTRACT

Plaintiff, JOSEPH MINK, restates, re-alleges and incorporates by reference paragraphs 1-30 of this Complaint as though fully set forth in this Count.

44.     Based on the representations and commitments made by Defendant as contained in the "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-

12

Centered Study of the Birmingham Hip Resurfacing System" (Exhibit B) Plaintiff,

JOSEPH MINK, accepted the offer being made by Defendant through Jason Weisstein,

MD, Defendants expressed or implied agent, executed the contract, purchased the BHR

system and underwent surgery with Defendant's approved doctor to have the BHR system

implanted in his left hip.

45.     The May 9, 2006, the Food and Drug Administration ("FDA") conditional

approved letter required Defendant to conduct a Study to include 350 patients at up to 8

sites with a minimum of 35 patients per site.  (Exhibit A)

46.     Defendant represented to Plaintiff in the above Agreement (Exhibit B) that

"he was one of up to approximately 350 patients in the overall US study at up to 8

participating hospitals."

48.     The "Consent to Participate in a Clinical Study Entitled: A Prospective

Multi-Centered Study of the Birmingham Hip Resurfacing System"(Exhibit B) was a

binding commitment by Defendant to the Plaintiff in consideration for Plaintiff agreeing

to purchase and have implanted the BHR system.

49.     The "Consent to Participate in a Clinical Study Entitled: A Prospective

Multi-Centered Study of the Birmingham Hip Resurfacing System"  committed

Defendant to:

a.    Study the results of the BHR device in the Plaintiff for up to 10 years after
      his surgery.

b.    Conduct additional tests and gather information from Plaintiff that are not
      usually required of hip replacement patients.

c.    Order evaluations between 6 weeks and 3 months after surgery and then at
      6 months, 1 year, 2 years, 3 years, 4 years and 5 years with a clinical exam
      looking at the hip and taking x-rays as a requirement.

    d.      Take blood samples to measure the ions in Plaintiff's body and kidney function.

    e.      Schedule visits to Plaintiff's surgeon more often than usual for clinical exams, x-rays and blood samples as specified in the Evaluation Intervals table.

    f.      Order a final clinical exam and x-ray and blood sample at 10 years after surgery unless the FDA requires Defendant to stop the study early.

    g.      Remain in contact with Plaintiff at required intervals by phone, internet or post-cards to insured adequate follow-up.

    h.      Pay all of the costs associated with required procedures or examinations that may not normally be considered "standard" for regular hip replacement surgery (eg. metal ion measurements).

    i.      Pay for all metal ion measurements and assessments of renal function.

    j.      Make other modest payments to participants to cover the costs of the extra travel and time associated with being in the study ($100 gift checks).

49.     Defendant breached its contractual duties to the Plaintiff when Jason Weisstein, MD moved to California less than 2 months after surgeryand Defendant did not arrange to transfer Plaintiff to another Defendant-trained and approved doctor to perform Study related tests and examinations to which Defendant committed.

50.     Eleven (11) months after Plaintiff's surgery, Defendant notified Plaintiff that he was discharged from the Study on May 14, 2012.  (Exhibit E)

51.     By terminating him as a Study Participant in the first year following Plaintiff's surgery, Defendant breached its contractual obligation to Plaintiff to examine, test, x-ray and take blood samples to monitor the effects of the BHR on the Plaintiff, and to pay the costs associated with the required procedures, including metal on metal assessments of renal function, samples of blood to measure metal ions in the blood and body and other tests to evaluate the BHR system.

52.     Plaintiff has been required, on his own, to pay costs of blood tests and medical treatment to deal with the toxic high levels of chromium and cobalt that were in his system with no support from Defendant as promised.

53.     As a result of Defendant's breach of the "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-Centered Study of the Birmingham Hip Resurfacing System" Agreement, Plaintiff has had to incur the cost of removing the BHR system because of the toxic levels of chromium and cobalt and the damage that it was causing to his body.

54.     But for the promises, representations and commitments made by Defendant in the "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-Centered Study of the Birmingham Hip Resurfacing System", Plaintiff would not have purchased the BHR system, and would have continued as scheduled to purchase a hip replacement from another manufacturer.

55.     Plaintiff, JOSEPH MINK, has been damaged by the Defendants breach, including the cost of the BHR system, the cost of the hospitalization and surgery, rehabilitation costs, medications, and related costs that Plaintiff would not have had to under go but for the Defendant's breach of contract and so that he would be put back in the position that he was in before the BHR surgery.

WHEREFORE, the Plaintiff, JOSEPH MINK, demands judgment in his favor and against the Defendant SMITH & NEPHEW, INC., in an amount in excess of $75,000 (seventy-five thousand dollars), plus costs of this suit.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

Plaintiff, JOSEPH MINK, restates, re-alleges and incorporates by reference paragraphs 1-30 of this Complaint as though fully set forth in this Count.

55.     On or before June 6, 2011, Defendant made misrepresentations to the Plaintiff that if he selected the Defendant's BHR system for his hip replacement, he would be included as one of 350 study participant in a 10 year study; that he would be monitored by Defendant for a minimum of 10 years, that the tests and extra monitoring costs would be paid by Defendant, and that the BHR system was a better hip replacement system for someone his age.

56.     Defendant knew or should have known that these representations were false or not true.

57.     Defendant made the above representations in order to induce Plaintiff to purchase its BHR system instead of a competitor's hip replacement system.

58.     Plaintiff reasonably relied on the Defendant's representations and purchased the BHR system to be implanted by Jason Weisstein, MD, a Defendant trained and approved doctor, instead of a hip replacement system from another manufacturer that was to be implanted by a different orthopedic surgeon.

59.     As a result of the above misrepresentations by Defendant, Plaintiff suffered pecuniary harm as the BHR system that was implanted was unsafe, was not manufactured in compliance with the Act, and had to be removed at great cost, expense, pain and suffering for which Plaintiff is entitled to recover from the Defendant.

60.    But for the above representations by Defendant Plaintiff would not have purchased the BHR system and is entitled to be placed in the condition that he would have been in but for the misrepresentations made by Defendant.

61.    Plaintiff, JOSEPH MINK, has been damaged by Defendant's negligent misrepresentations, and such damages include the cost of the BHR system, the cost of the hospitalization and surgery, rehabilitation costs, medications, and related costs that Plaintiff would not have had to under go but for the Defendant's breach of contract and so that he would be in the position that he was in before the BHR surgery.

WHEREFORE, the Plaintiff, JOSEPH MINK, demands judgment in his favor and against the Defendant SMITH & NEPHEW, INC., in an amount in excess of $75,000 (seventy-five thousand dollars), plus costs of this suit.

**COUNT V**
**BREACH OF EXPRESSED OR IMPLIED WARRANTY**

Plaintiff, JOSEPH MINK, restates, re-alleges and incorporates by reference paragraphs 1-30 of this Complaint as though fully set forth in this Count.

62.    Defendant is a merchant within the Florida Uniform Commercial Code and its BHR system is a product that is approved for sale by the FDA.

63.    It is implied that Defendant warrants that the BHR system is merchantable.

64.    Plaintiff purchased from Defendant the BHR system AND the commitment that is set forth in the "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-Centered Study of the Birmingham Hip Resurfacing System" (Exhibit B).

65.     The "Consent to Participate in a Clinical Study Entitled: A Prospective Multi-Centered Study of the Birmingham Hip Resurfacing System" was a part of the bargain and created an expressed warranty that the BHR system that was purchased conformed to the affirmation.

66.     Furthermore, Defendant expressly warranted that its BHR system was in full compliance with the FDA Pre-market Approval conditions that are set forth in the May 9, 2006 PMA letter (Exhibit A) and that the BHR system was safe and effective for use.

67.     The BHR system sold to and implanted into Plaintiff, JOSEPH MINK, was not merchantable or of merchantable quality, as the product caused toxic levels of chromium and cobalt to develop in Plaintiff's body to the extent that it  was unsafe to remain in the Plaintiff's body.

68.     The BHR system was unreasonably dangerous or defectively manufactured in violation of the Act and Florida law and had to be removed for the health of the Plaintiff.

69.     Plaintiff, JOSEPH MINK, has been damaged by Defendant's breach of expressed and implied  warranties, and such damages include the cost of the BHR system, the cost of the hospitalization and surgery, rehabilitation costs, medications, and related costs that Plaintiff would not have had to under go but for the Defendant's breach of contract and so that he would be in the position that he was in before the BHR surgery.

WHEREFORE, the Plaintiff, JOSEPH MINK, demands judgment in his favor and against the Defendant SMITH & NEPHEW, INC., in an amount in excess of $75,000 (seventy-five thousand dollars), plus costs of this suit.

## **JURY DEMAND**

Plaintiff hereby invokes his right to a trial by jury as to all counts and issues pled against the Defendant in this case.

Dated this 5th day of June 2015.

By: s/ *Robert E. O'Connell*
    ROBERT E. O'CONNELL, ESQ.
    Florida Bar No.: 315842
    ROBERT E. O'CONNELL. P.A.
    1701 W. Hillsboro Blvd., Suite 304
    Deerfield Beach, Florida 33442
    Telephone:     (954) 482-0424
    Facsimile:(954) 977-7676
    Email: reo@reo-law.com (primary)
            office@reo-law.com (second)